UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-CR-20474-BLOOM

UNITED STATES OF AMERICA,

                            **Plaintiff,**

vs.

**RODGER GONZALEZ, JR.,**

                            **Defendant.**

_____/

UNITED STATES'S RESPONSE TO
DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

      Defendant Roger Gonzalez Jr. has filed a motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(2). (DE:93). In sum, the defendant argues his April 2012 sentence of 327-months imprisonment related to his participation in a violent armed robbery attempt and 3 other armed home invasion style robberies should be reduced to time served. The defendant asserts he should be released early to care for his mother's husband, whom his mother married after the defendant was incarcerated for the instant offense.

      In response, the United States respectfully submits that the defendant has failed to meet his burden and allege facts, or provide proffered evidence, sufficient to establish the requisite "extraordinary and compelling reason" necessary for the Court to even consider granting the requested relief. Further, the facts underlying the defendant's offense of conviction were violent, the defendant admitted participation in three additional armed home-invasion style robberies, and the defendant has a substantial criminal history. Thus, both the 3553(a) factors and the need to

1

protect the public from further offenses by this defendant mitigate heavily against early release. The defendant's motion should be denied.

## FACTS OF THE OFFENSE AND RELEVANT PROCEDURAL HISTORY

During the summer of 2011, Miami Dade Police Department (MDPD) detectives received information that Defendant Roger Gonzalez Jr. and his codefendants were involved in multiple armed home invasion style robberies throughout Miami-Dade County and elsewhere. *See* DE:30 at ¶ 6. During these violent home invasion robberies, the victims were robbed at gunpoint, beaten, and tied up before their belongings were taken. (*See* DE:1 at ¶¶ 9, 10.) One victim was 80 years old. (Id. at ¶ 10c). On June 30, 2011, the defendant was arrested when he and his coconspirators attempted to rob a location that they believed was a marijuana stash house, but was instead a police ruse. (DE:30).

On August 18, 2011, the Grand jury returned a 12-count indictment charging the defendant with narcotics, robbery, and firearms offenses related to his participation in the June 30th attempted robbery (DE:19). Additional counts charged the defendant with robbery and firearm offenses related to his participation in three separate home invasion style robberies occurring on April 13, 2011, May 19, 2011, and June 2, 2011. (*Id*.). On December 23, 2011, the defendant pleaded guilty to Count 5 of the Superseding Indictment pursuant to a written factual proffer and plea agreement (DE:29, 30, 31, and 46). According to the terms of that plea agreement, both the defendant and the United States agreed to recommend a sentence of 327 months' imprisonment. (DE:31 at ¶ 8). Both the United States and the Defendant explicitly agreed this 327-month sentence was within the applicable guideline range, and even if it was not, a 327-month sentence was consistent with the sentencing factors set forth in 18 U.S.C. § 3553(a). (*See id*. at 3553(a)). In exchange for the guilty plea, the United States dismissed the other 11 counts of the superseding indictment,

releasing the defendant from what otherwise applicable mandatory minimum 80-year sentence. (*See id*. at ¶ 2).[1] While the other robbery counts were dismissed, however, the defendant conceded in the factual proffer that the United States could prove beyond a reasonable doubt that he had been involved in the other charged offenses. (*See id*. at ¶ 6).

On April 25, 2012, the defendant was sentenced to 327-months confinement, consistent with the parties negotiated plea agreement. (DE:29, 30, 31, 46). On June 27, 2012, the Court amended Petitioner's sentence to include restitution (Cr. DE:38).

The defendant did not file a direct appeal. In 2014, however, the defendant did file a 2255 motion that breached his obligation under the plea agreement and sought a lower sentence. (*See* DE:39, 43, 44) and *Rodger Gonzalez v. U.S.*, 14-CV-22854-UU (DE:6, 7, 8). On September 10, 2015, that 2255 motion was denied. (DE:47). A second motion seeking to vacate his conviction was also denied on February 27, 2020. (DE:89).

On November 2, 2023, the defendant filed a motion seeking his immediate compassionate release. (DE:93). The defendant is not currently scheduled to be release until September 17, 2034. https://www.bop.gov/inmateloc/.

## THE RELEVANT STATUROY FRAMEWORK

Once imposed, there is no inherent authority for a court to modify a sentence of imprisonment. *United States v. Puentes*, 803 F.3d 597, 605-06 (11th Cir. 2015). One limited

---

[1] The superseding indictment charged the defendant with 4 violations of 18 U.S.C. § 924(c)(1)(A). The first § 924(c)(1)(A) conviction carried a mandatory minimum sentence of five years. At the time (2011), each subsequent 924(c) conviction carried a mandatory minimum 25-year sentence. Further, all four sentences would have to be served consecutive to each other and consecutive to any additional sentence that was awarded under the remaining 8 counts of the indictment pursuant to the guidelines. *See* 18 U.S.C. § 924(c)(1)(A)(i) and (c)(1)(C) (2011).

exception to this general rule is set forth in 18 U.S.C. § 3582(c). Pursuant to this section, "The Court may not modify a term of imprisonment once it has been imposed except that –

(1)  in any case –

(A)  the court, . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . *after considering the factors set forth in section 3553(a)* to the extent that they are applicable, if it finds that  --

(i) *extraordinary* and *compelling* reasons warrant such a reduction; . . .

and that, such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."

*Id*. (emphasis added).  Subsection (a) of the Sentencing Commission's Policy Statement, as amended on November 2, 2023, generally tracks the language of 3582(c) by requiring a Court to consider the 3553(a) factors, and by determining that (1)(A) "extraordinary and compelling reasons warrant the reduction, . . . [and] (3) that the reduction is consistent with the policy statement."  U.S.S.G. § 1B1.13 (Nov. 1, 2023).  Additionally, the Commission also requires as part of the policy statement that the Court determine that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. §3142(g)." § 1b1.13(a)(2).

In relevant part here, the newly amended policy statement's definition of an "extraordinary and compelling reason" reads as follows:

(3)  FAMILY CICRUMSTANCES OF THE DEFENDANT.—

(A) The death or incapacitation of the caregiver of the defendant's minor child or minor children the defendant's child who is 18 years of age or older and incapable of self-care because of a mental or physical disability or a medical condition.

4

> (B) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
>
> (C) The incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent.
>
> (D) The defendant establishes that circumstances similar to those listed in paragraphs (3)(A) through (3)(C) exist involving any other immediate family member or an individual whose relationship with the defendant is similar in kind to that of an immediate family member, when the defendant would be the only available caregiver for such family member or individual. For purposes of this provision, "immediate family member" refers to any of the individuals listed in paragraphs (3)(A) through (3)(C) as well as a grandchild, grandparent, or sibling of the defendant.

U.S.S.G. § 1B1.13(b)(3) (Eff. Nov. 1, 2023). When a defendant's compassionate release motion is filed, "Defendant bears the burden of establishing that compassionate release is warranted. *United States v. Varela*, 2023 WL 6142462 (S.D. Fla., Sep. 20, 2023) (slip copy), citing *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013).

## ARGUMENT

Defendant Roger Gonzalez Jr.'s motion for early release should be denied for multiple reasons. First, the defendant's existing sentence, *as stipulated to by the defendant himself during his plea agreement*, is consistent with the sentencing factors set forth under 18 U.S.C. § 3553(a). The defendant's motion also fails to establish that the defendant, if released, will not pose a danger to the public, a factor not only addressed by 3553(a)'s but further emphasized by U.S.S.G. § 1B1.13(a)(2). And even if the Court was inclined to reduce a violent offender's sentence, the Court cannot do so because the defendant's motion and supporting documentation has failed to establish an extraordinary and compelling basis necessary as a prerequisite for the Court to even have discretion to grant the defendant's request for relief.

1. **The defendant has exhausted his administrative remedies.**

The United States accepts that the defendant has exhausted his administrative remedies, pursuant to 3582(c)(1)(A) and may therefore file this motion directly with the court.

2. **The Defendant Has Failed To Establish the requisite "Extraordinary and Compelling Reason" necessary to justify consideration of compassionate release.**

Defendant Rodger Gonzalez Jr. argues that he fits within the amended policy statement's definition of extraordinary and compelling reasons for release. Specifically, the defendant argues that his wife's current husband, Edward Heflin-El, is: (1) medically incapacitated; (2) that Mr. Heflin-El's relationship with the defendant is "similar in kind" to that of a parent; and (3) that the defendant is "the only available caregiver for the parent." (*See* DE:93 at *9-11.). In response, the United States respectfully submits that the defendant's pleading fails to assert sufficient facts necessary to meet his burden of establishing any, much less all three, of these prerequisite facts.

First, in regard to "medical incapacitation," the defendant has submitted some medical records under seal that establish that Mr. Heflin-El is suffering from a number of serious chronic illnesses, including advanced kidney disease. (DE:94) But the records are incomplete. While the records indicate that Mr. Heflin-El is sick and in need of a transplant, there is no information in those records that allow the government or the Court to fully assess the extent of Mr. Helfin-El's disability, his ability to provide self-care, and his prognosis. (*See id.*). Further, while the government is sympathetic to Mr. Helfin-El's description of his health problems, it does appear from that letter that Mr. Helfin-El is able to provide at a substantial amount of self-care, that he has a supportive wife, and that he has other family members living in the area. (*See* DE:91-1.). The submitted evidence does not on its face establish that Mr. Heflin-El is incapable of taking care of himself, his likelihood of recovery, or the anticipated wait time for a new kidney. (DE:94)

6

Because the defendant has the burden of proof on this issue, additional information would need to be provided for the United States or the Court to meaningly evaluate whether Mr. Heflin has been incapacitated such as to fall within the scope of § 1b1.13(a)(2). *See United States v. Gunkel*, 2023 WL 6160612, *2 (N.D. Okl. Sep. 21, 2023) (declining 3582 motion in part due to defendant's failure to present "medical records or other supporting evidence establishing his parents are medically incapacitated and the need for in-home care.").

Second, the defendant's claim must fail because he cannot establish the requisite parental relationship with Mr. Heflin-El. Pursuant to § 1B1.13(b)(3)(C) and (D), the defendant can only establish an extraordinary and compelling reason if his relationship with Mr. Heflin-El is "similar to that" of a "parent." *See* § 1B1.13(b)(3)(C) and (D). This is not the case.

In his motion, the defendant identifies Mr. Heflin-El as his "stepfather" and conclusively asserts the relationship is "similar in kind" to that of a "parent." (DE:93 at 9). While the guidelines do not provide a definition for "parent," the meaning of the word is not ambiguous. Specifically, the dictionary defines a "parent" as "one that begets or brings forth offspring," or "a person who brings up and cares for another." See https://www.merriam-webster.com/dictionary/parent#. Mr. Heflin-El's relationship to the defendant cannot fit within either category.

The defendant does not allege that Mr. Heflin-El brought up and cared for the defendant. (*See* DE:93). To the contrary, any assertion of a parental relationship would be contradicted by the 2012 PSR. In that PSR, Roger Gonzalez Sr. (deceased)[2] was identified as the spouse of the defendant's mother (Maria Ortega) and the defendant's biological father. *See* PSR at ¶ 37. Roger Gonzalez Sr. lived with the family until he was incarcerated for a home invasion robbery when the

---

[2] Roger Gonzalez Sr. was killed during the police's attempt to arrest the defendant's armed robbery crew.

defendant was nine years old. PSR at ¶ 37. When the defendant was 11 years old, Maria Ortega and Roger Gonzalez Sr. divorced while Gonzalez Sr. was still in prison. PSR at ¶ 37. According to the defendant, he was raised by his mother (Maria Ortega), who married Carlos Gutierrez with whom the defendant described having a good relationship. *See* PSR at ¶ 37. Maria Ortega and Mr. Gutierrez divorced in 2005 (See PSR at ¶ 37), *at which time Mr. Gonzalez would have been a 27-year old adult*.[3] The PSR, written in 2012, makes no mention of Mr. Efrin-El.

Indeed, the defendant's motion is notably silent regarding the date of Maria Ortega's and Mr. Efrin-El's marriage. It appears the defendant's mother was using the name "Ortega" at least as late as 2017, when she filed an affidavit in this matter. (DE:54, 68)[4] Thus, Mr. Efrin-El likely married the defendant's mother within the last six years, at which time the defendant was an incarcerated adult male in his late thirties or early forties. Under such circumstances, the conclusory assertion Mr. Efrin-El's relationship with the defendant is similar to a "parent" is unambiguously contradicted by the record.

And third, the letters submitted with the defendant's motion do not establish that the defendant is the "sole" family member available to care for Mr. Efrin-El. (DE:93). According to the letters, the Mr. Helfin-El is not wholly incapacitated and lives in Homestead, Florida, with his wife, Marie Helfin-El (formerly "Ortega"). The letters also document that multiple family members live in the area and are available to provide assistance - albeit at varying levels of inconvenience. (DE:93-1 through 93-5). For example, the defendant's daughter, Dominque Heflin, lives in Homestead, Florida. (DE:93-3). Marie Helfin-El's daughter, Jessinia Gonzalez,

---

[3] The defendant was born in 1978.

[4] Ms. Ortega's affidavit was filed in support of her son's motion to recover cash seized at the time of his arrest. The Court found "troubling" that the defendant initially claimed the cash was his, but later claimed it was his mother's money after government pointed out it would then be subject to seizure for the purpose of restitution. (*See* DE:68 at *3).

8

also lives only an hour from her mother. (93-3). Marie Helfin's granddaughter lives in Westchester, which is approximately 30 minutes from Homestead. (DE:93-3). A defendant's sentence of imprisonment inherently impacts the lives of a defendant's family members, but it is only when the defendant is the "only available caregiver" to provide care that the Court may consider the extraordinary remedy of compassionate release. While it may be difficult for the children to balance other family commitments, such a situation in itself is not "extraordinary and compelling." *See Gunkel*, 2023 WL 6160612 at *3 (finding two siblings, one living in a different state, sufficient to defeat the defendant's claim that he was the only available caregiver to take care of two ailing parents). *See also, United States v. Carroll*, 2012 WL 807483, *3 (N.D. Ala. 2021 (finding defendant's argument his siblings were too busy with their own lives to help his parents unpersuasive and that arrangements short of the defendant's early release, while difficult, would be possible).[5]

In conclusion, this Court does not have the authority to grant the defendant's motion for compassionate release because the defendant has not met his burden of establishing that a parent, or person similar in kind to a parent, is medically incapacitated and that the defendant is the only available caregiver for that incapacitated parent. The defendant's motion should be dismissed without further consideration.

    3.    **The Defendant's Request for Early Release is Inconsistent with the Sentencing Factors of 18 U.S.C. § 3553(a).**

Even if the defendant had established the "extraordinary and compelling reasons" necessary to be eligible for compassionate relief, *which this defendant has not*, § 3582(c) still requires a court to consider whether the requested reduction is consistent with 18 U.S.C. § 3553(a).

---

[5] The defendant's motion also does provide any information regarding the parent's finances or what other family members may live in the area, or be willing to move to the area.

9

Relevant 3553(a) factors in this instance include: the "characteristics of the defendant;" "the nature and circumstances of the offense;" "the seriousness of the offense;" "deterrence to criminal conduct;" "[protection] of the public from further crimes by the defendant," and "[promoting] respect for the law." *See* 18 U.S.C. § 3553(a)(1). When these factors are applied to this case, it isn't close – the early release of the defendant should be denied.

*The seriousness of the misconduct weighs heavily against early release.* The stipulated facts establish that the defendant was the member of an active and dangerous armed robbery crew operating in the South Florida area. *See* DE:30 at ¶ 6. While the defendant characterizes his offense as a "firearm possession charge," the facts admitted during the plea colloquy demonstrate that the firearms at issue were possessed by the defendant and his coconspirators for the purpose of carrying out a violent armed robbery. (*See* DE:30 at ¶¶ 1-5). The dangerousness of the conspiracy was illustrated by the death of the defendant's armed coconspirators when they failed to comply with police commands during the arrest (*See id.* at ¶ 4.).

While the defendant seeks to characterize himself a mere getaway driver, the defendant cannot escape responsibility for the acts of his coconspirators. The stipulated facts demonstrate that the defendant was fully aware of the planned robbery, the possession of firearms to commit that robbery, and the potential for firearms to be fired during the robbery. (*See id.* at ¶ 3). Indeed, the defendant's prior participation in at least three prior robberies with this same home invasion group made the defendant well aware for the potential for violence during the planned June 30th robbery. These prior robberies were violent and resulted in people being hurt. For example, as laid out in the criminal complaint, the defendant's cellular telephone placed him at the location of a May 19, 2011, home invasion robbery. (*See* DE:10 at *6). During that robbery, masked and armed assailants entered the residence, threw the victims to the floor, and severely beat two of the

10

victims while they ransacked the residence. (*See* DE:10 at *6). In another robbery, the defendant's cellular phone placed him in the area where four masked assailants entered a Miami Dade residence, beat the 80-year old victim, stole his property, and then left the victim tied up in the residence. *See id*. at *6-7.[6] In short, the Court's 327-month sentence is consistent with both the seriousness of the June 30th offense and the defendant's role in that offense, as demonstrated by his continued and repeated participation in multiple violent robberies.[7]

*Continued incarceration is necessary to protect the public from further offenses by this defendant.* While the defendant now characterizes his participation in the home invasion robberies as merely an effort to please his father (*See* DE:93 at *2), the defendant's lengthy criminal record paints a different picture. At the time he pleaded guilty, the defendant already had a lengthy criminal record and was classified a career offender. *See* SPR at ¶¶ 22 – 29. The defendant squandered repeated opportunities to change course while on probation, instead committing

---

[6] The superseding indictment charged the defendant with federal crimes related to three armed home-invasion style robberies, occurring on June 2, 2011, May 19, 2011, and April 13, 2011. *See* DE:11 (Counts 7-12 ). While these counts were dropped pursuant to the plea agreement, the defendant admitted his participation in those three armed robbery in the written factual proffer. (DE:30 at *3). While the defendant's cell phone implicated the defendant's participation in other armed home invasions, as spelled out in the Complaint, the three robberies identified in the indictment were instances where federal jurisdiction was clearly established through the groups demand for drugs or commission of a carjacking.

[7] In an effort to minimize the misconduct, the defendant repeatedly attempts to characterize the defendant's conviction in this case as a mere firearm offense. *See, e.g.*, DE:93 at 18. But the defendant was convicted of possessing a firearm in furtherance of a crime of violence and drug trafficking crime. During the arrest, multiple conspirators died, including the cooperating source, when the conspirators and source failed to comply with police directions to get on the ground. Further, this attempted robbery was preceded by three additional armed home invasion style robberies which the government could charge because the defendant and his conspirators stole cars during the course of those armed robberies or believed the victims had drugs that they could steal. *The defendant himself stipulated the negotiated 327-month sentence was consistent with the sentencing guidelines and sentencing factors set forth in 18 U.S.C. § 3553(a).* The defendant's misconduct over an extended period of time was egregious, dangerous, and motivated by profit. The 327-month sentence is reasonable.

repeated probation violations that resulted in a four-year prison sentence. *See id*. at ¶¶ 22, 25-28. While the defendant has reportedly adjusted to living within a controlled custodial environment, nothing short of incarceration appears to have prevented this defendant from committing additional crimes.[8]

While these reasons are in themselves sufficient to justify denial of the defendant's motion, other 3553(a) factors also do not support the defendant's immediate release. For example, the defendant's sentence was within the advisory guideline range. Further, at the time of sentencing, the defendant himself stipulated that a 327-month sentence was consistent with the sentencing factors set forth in 18 U.S.C. § 3553(a). Now the defendant has received the benefit of his bargain and escaped a longer sentence, reducing the defendant's sentence now will not promote respect for the law. To the contrary, when a lengthy sentence is imposed for violent crimes involving firearms, it is almost inevitable that family members will be adversely affected. Allowing a defendant to abruptly reduce his sentence because a family member predictably got sick during that time period will create unjustified sentencing disparities and erode respect for the law by making sentencing indeterminate in most cases, rather than the exceptional cases that Congress intended with the passage of 18 U.S.C. § 3582(c).

---

[8] The defendant's motion also minimizes his propensity for violence, by characterizing his 2004 aggravated battery conviction as an instance where the defendant "went to the aid of his sister because he believed her to be in immediate physical danger." (DE:93 at 15.). The PSR description of the offense conduct, paints a very different picture. Specifically, the defendant, then 25, became violent during an argument and pushed one female (Victim 1) to the ground. (*See* PSI at ¶ 25.) While the defendant's sister attacked Victim 1 by striking her in the face, the defendant approached Victim 1 from behind and struck her with a metal object. (*Id*.) When the second female victim tried to intervene, the defendant struck that female victim in the head and leg with the metal object. (*Id*.). After the defendant and his sister fled the scene, both victims were transported to the Miami Children's Hospital. (*Id*.). At the hospital, one victim received multiple stitches on both sides of her face and the other victim received multiple stitches on her head. (*Id*.).

4.  **The defendant's prison record does not establish he is not a danger to the community if released from prison.**

While overlapping with the § 3553(a) factors, the Commission specifically warned that Court's considering compassionate release motions must ensure that "the defendant [seeking release] is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. 3142(g)." U.S.S.G. § 1b1.13(a)(2). In this case, the defendant argues the Court should find he is rehabilitated because he has not gotten in trouble while in prison, has worked a job, and taken some educational classes. These factors, while encouraging, are not sufficient to overcome the true issue – it is not the defendant's behavior in the structured environment of a prison that is a risk, but the defendant's recurring violations of the law when he is released from prison. The defendant's criminal history shows not a consistent pattern of breaking the law, but also shows multiple instances where controls less stringent than imprisonment failed to prevent the defendant's commission of new crimes. Even more significant, the crimes committed by the defendant in the instant offense were over an extended period of time, involved firearms, and involved violence. While the defendant now seeks to be reunited with his family, those family members were not able to control the defendant's behavior before. At least one family member, the defendant's sister, also previously participated in the defendant's aggravated felony of two female victims. *See* PSI at ¶ 25.

## CONCLUSION

For the reasons set forth above, the United States respectfully submits the defendant's motion should be denied.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By: s/ *Anthony W. Lacosta*
Anthony W. Lacosta
Assistant United States Attorney
Court No. A5500698
500 S. Australian Avenue
West Palm Beach, FL 33401
Email: Anthony.Lacosta@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on November 16, 2023, a copy of this pleading was filed electronically with the Court.

s/Anthony W. Lacosta
Anthony W. Lacosta
Assistant United States Attorney