**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

RODGER GONZALEZ, JR.,                    CASE NO.:    11-CR-20474-UU

    Petitioner,

v.

UNITED STATES OF AMERICA,

    Respondent.
_____/

**DEFENDANT RODGER GONZALEZ, JR.'S REPLY TO**
**GOVERNMENT'S RESPONSE TO MOTION TO REDUCE SENTENCE**
**PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**

Defendant Rodger Gonzalez, Jr., has filed a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) and requested a reduction of his sentence to time served based on extraordinary and compelling circumstances. The basis for Mr. Gonzalez's motion is the incapacitation of Mr. Gonzalez's stepfather, for whom Mr. Gonzalez is the only available caregiver, along with Mr. Gonzalez's rehabilitation and the harsh conditions under which Mr. Gonzalez has been incarcerated. Doc. 93 at 8-14. Further, Mr. Gonzalez is not a danger to the community and his release would be consistent with the sentencing factors set forth under 18 U.S.C. Section 3553(a). *Id.* at 14-18.

The government has responded in opposition to Mr. Gonzalez's motion, contending that Mr. Gonzalez has not established that his circumstances are extraordinary and compelling and that the Section 3553(a) factors and the need to protect the public weigh against Mr. Gonzalez's release. For the reasons discussed below, the court should reject the government's contentions, recognize that extraordinary and compelling circumstances exist here, and reduce Mr. Gonzalez's sentence to time served.

**REPLY MEMORANDUM**

**I.    Extraordinary and compelling reasons support a sentence reduction for Mr. Gonzalez.**

Mr. Gonzalez explained in his motion to reduce sentence that several "extraordinary and compelling" reasons under the compassionate release Policy Statement, U.S.S.G. Section 1B1.13,

exist in his case: the need for him to serve as a caregiver to his incapacitated stepfather; his rehabilitation; and the difficult conditions of his incarceration. Doc. 93 at 8-14. The government's response focuses on Mr. Gonzalez's family circumstances. Its arguments are not well-taken.

### A. Mr. Gonzalez's family circumstances are an extraordinary and compelling reason for a reduction in sentence.

Mr. Gonzalez's family circumstances fall within the newly-revised Section 1B1.13(b)(3)(D) because his family's circumstances are similar to those in which a defendant's parent is incapacitated. Mr. Gonzalez's relationship with his stepfather is "similar in kind to that of an immediate family member," and Mr. Gonzalez is the only available caregiver for Mr. Heflin-El. *See* Doc. 93 at 9-11.

#### 1. Mr. Heflin-El is incapacitated.

Mr. Gonzalez's compassionate release motion described and attached documentation of Mr. Heflin-El's debilitated physical condition. Doc. 93 at 9-10 & Sealed Ex. A. The government acknowledges that the sealed medical records furnished to the Court "establish that Mr. Heflin-El is suffering from a number of serious chronic diseases, including advanced kidney disease." Doc. 96 at 6. The government asserts, however, that Mr. Heflin-El's records do not provide sufficient information to allow the Court to evaluate the extent of Mr. Heflin-El's disability, his ability to provide self-care, the potential wait time for a new kidney, or the likelihood of his recovery. *Id.*

To the contrary, as to the extent of Mr. Heflin-El's disability, his Veterans Administration ("VA") records, which have been provided to the Court, list the conditions Mr. Heflin-El has been diagnosed with and specifically state the degree to which they contribute to his disability. Doc. 93 Sealed Ex. A at 4-7. The VA recognizes that Mr. Heflin-El is "100% disabled." *Id.* at 4. According to the VA, the agency assigns disability percentages based on how severely the patient's disability impacts their daily life. VA, "VA Financial Benefits," *available at* https://www.va.gov/geriatrics/pages/VA_Financial_Benefits.asp. Mr. Heflin-El's congestive heart failure alone renders him 100% disabled. Additional conditions, including his chronic kidney disease (60%), diabetes (40%), diabetic peripheral neuropathy in each limb (20% for each limb), and multiple joint injuries (10% for each joint), also substantially contribute to his physical disability. Doc. 93 Sealed Ex. At 5-7. Mr. Heflin-El also experiences post-traumatic stress disorder, *id.* at 5, which makes the importance of a caring and sympathetic family care provider that much greater.

With regard to how long Mr. Heflin-El may be on the kidney transplant waiting list, given the uncertainties inherent in waiting for a compatible organ from a deceased donor, no one can know that precisely. The National Kidney Foundation ("NKF") reports that the average wait time for a donated kidney is three to five years, but can vary greatly. NKF, "Understanding the Transplant Waitlist," *available at* https://www.kidney.org/content/understanding-transplant-waitlist#:~:text=Once%20you%20are%20added%20to,geographical%20regions%20of%20the%20country. A letter from Mr. Gonzalez's daughter describing her grandfather's situation it attached as Exhibit J. As she explains, reducing the time Mr. Heflin-El spends on dialysis will increase the likelihood a transplant is successful. Ex. J. As explained in Mr. Gonzalez's compassionate release motion, Mr. Gonzalez wishes to serve as a living kidney donor, Doc. 93 at 11; if it is determined that he is a match and is able to do so, that would of course significantly speed the process of Mr. Heflin-El receiving a new kidney. Even if he is not a match, his willingness to serve as a donor could be the starting point for a chain of donations that would result in Mr. Heflin-El receiving a donated kidney. *See* Ex. J; *see also* NKF, "Programs for Donor/Recipient Pairs with Incompatible Blood Types," *available at* https://www.kidney.org/transplantation/livingdonors/incompatiblebloodtype.

Such a development, however, would not alleviate Mr. Heflin-El's need for a care provider. As reflected in the VA's disability determination letter, attached as Exhibit H, the VA has determined that Mr. Heflin-El's disability is "total and permanent." While it is hoped that receiving a kidney transplant would improve the quality of Mr. Heflin-El's life by ending his need for daily dialysis, that would not be a cure-all for Mr. Heflin-El that would result in him no longer needing extensive care. The medications that ensure a transplanted organ is not rejected come with their own host of complications. *See, e.g.*, NKF, "Care After Kidney Transplant," *available at* https://www.kidney.org/atoz/content/immunosuppression. Further, even after receiving a donated kidney, Mr. Heflin-El will still be in congestive heart failure; his heart condition is so severe that it alone is enough to render him 100% disabled. *See* Doc. 93 Sealed Ex. A at 6.

### 2. Mr. Gonzalez is the only available care provider for his stepfather.

The government next states that it appears that Mr. Heflin-El is able to provide "a substantial amount of self-care," has a supportive wife, and has other family members in the area. Doc. 96 at 6, 8. With regard to Mr. Heflin-El's ability to provide self-care, the question before the Court is not whether there are *any* aspects of self-care that Mr. Heflin-El is still able to perform,

but whether there are numerous basic aspects of daily living that he is not cannot perform without significant assistance. Along with the medical records provided to the Court showing that Mr. Heflin-El is 100% disabled, Mr. Heflin-El himself explained in the letter attached as Exhibit B to the compassionate release motion that he barely has the strength to stand and struggles to walk even 20 feet. Doc. 93 Ex. B. Mr. Heflin-El is also losing vision in both eyes. *Id.* Although he has multiple doctor's appointments per week, he is no longer able to drive. *Id.* And he is beginning to show signs of cognitive impairment. *Id.* Mr. Heflin-El is not able to keep up with the specific dietary guidelines that are required for successful dialysis. Ex. J. He also needs assistance with tasks such as showering, driving, and complying with his complicated medication regimen. *Id.* Additionally, neither he nor his wife is capable of maintaining their home. *Id.*

The presence of Mr. Heflin-El's wife – who is Mr. Gonzalez's mother – does not lessen Mr. Heflin-El's need for a caregiver. As Mrs. Heflin-El explained in the letter attached as Exhibit C to the compassionate release motion, Mrs. Heflin-El is physically declining herself. Doc. 93 Ex. C. Medical records for Mrs. Heflin-El[1] are Sealed Exhibit F[2] to this motion. They show that Mrs. Heflin-El had to have back surgery (a discectomy and fusion) in 2011. Sealed Ex. F at 114-17. Over time, the discs in her back have degenerated further. Additionally, as described in the compassionate release motion, Ms. Heflin-El suffers from fibromyalgia and gastritis. Sealed Ex. F at 1. These conditions result in chronic pain. *See, e.g., id.* at 2, 23, 35, 77. Mrs. Heflin-El has also experienced a significant, unexplained weight loss and is physically frail.[3] As a result, Mrs. Heflin-El is not able to provide the care her husband needs, and in fact herself needs assistance. While Mrs. Heflin-El is not "incapacitated," and her need for assistance has therefore not been specified as an additional basis for compassionate release, she is not able to provide the level of care Mr. Heflin-El needs. *See* Ex. J. Mr. Gonzalez if released would provide care for his mother as well as his stepfather.

---

[1] Certain portions of Ms. Heflin-El's medical records, such as mammography reports, pathology reports, lab results, and EKGs have been omitted from the sealed exhibit of medical records to reduce its volume; should the Court request it, however, the complete medical records are available and can be provided to the Court.

[2] A motion to file Mrs. Helfin-El's medical records under seal remains pending at the time of this filing. The exhibit containing them will be filed upon a ruling on this motion.

[3] Mrs. Heflin-El's unexplained weight loss first appeared in her medical records in October 2020, at which point she had lost 30 pounds over the course of the prior year with no known cause and then weighed 128 pounds. Sealed Ex. F at 108, 111. As of Mrs. Heflin-El's most recent medical visit in November 2023, her weight was 113 pounds (Mrs. Heflin-El is 5'6"). *Id.* at 4.

4

Mr. Gonzalez's other family members are not, as the government speculates, Doc. 96 at 6, available to provide the care Mr. Heflin-El needs. The family member who is geographically the closest, Mr. Gonzalez's stepsister, lives 30 minutes away and has four young children. Doc. 93 Ex. D. She explained in her letter to the Court that, while she has done her best to provide the care Mr. and Mrs. Heflin-El need, at this point, their care needs have expanded beyond the scope of what she is capable of providing. The type of care Mr. Heflin-El needs cannot be provided with brief visits a few times per week. Mr. Heflin-El needs someone who is available full-time, day in and day out, to provide the care he needs, and family members who live between 30 to 60 minutes away or more, with their own children, jobs, and responsibilities, are simply not able to provide that level of care. Mr. Gonzalez would be able to, and wishes to provide this service to his family.

### 3. Mr. Heflin-El's relationship to Mr. Gonzalez is "similar in kind" to that of an immediate family member.

Under Section 1B1.13(b)(3)(D), extraordinary and compelling circumstances may exist where "an individual whose relationship with the defendant is similar in kind to that of an immediate family member" is incapacitated, and the defendant is the only available care provider for that person. Here, the incapacitated person is Mr. Gonzalez's stepfather, his mother's husband.

The government suggests that Mr. Heflin-El's relationship with Mr. Gonzalez is not akin to that of a family member, because Mr. Heflin-El did not marry Mr. Gonzalez's mother until after Mr. Gonzalez was in prison. Doc. 96 at 7. The government further argues that because Mr. Heflin-El is not Mr. Gonzalez's biological father and Mr. Heflin-El did not raise Mr. Gonzalez as a child, Mr. Helfin-El is not "similar in kind" to a "parent." *Id.*

The government's reading of Section 1B1.13(b)(3)(D) – and its conception of what makes a "family" – is overly narrow. A person need not raise another from a child, nor be married to a family member at the time their relationship developed, to be akin to an immediate family member. Mr. Heflin-El has been in a committed relationship with Mr. Gonzalez's mother since 2010, and the couple married in 2016.[4] Mr. Gonzalez developed a relationship with Mr. Heflin-El well

---

[4] The government points out that Mr. Gonzalez's mother filed an affidavit in this matter under her maiden name of "Ortega" in 2017, from which the government concludes that Mr. and Mrs. Heflin-El married at some point after that date. Doc. 96 at 8. That assumption appears to rest on outdated premises regarding when and whether a married woman should adopt her husband's surname. In any event, as noted, the couple married in 2016 after having been in a committed relationship since 2010.

5

before he was arrested. Mr. Heflin-El has stayed in close communication with Mr. Gonzalez while Mr. Gonzalez has been in prison. In fact, before Mr. Heflin-El proposed to Mr. Gonzalez's mother, he visited Mr. Gonzalez in prison to make sure he had Mr. Gonzalez's blessing.

Mr. Heflin-El also regularly visited Mr. Gonzalez in prison for as long as he was able to.[5] Sadly, Mr. Heflin-El has been unable to visit Mr. Gonzalez for several years now. This was initially due to the COVID lockdowns; then, by the time travel was safe and visitation was possible, Mr. Helfin was no longer able to travel due to his disabilities and his need for nightly dialysis. A photograph of Mr. Gonzalez with Mr. Heflin-El, his grandson, Mrs. Heflin-El, and Mr. Gonzalez's daughter, visiting Mr. Gonzalez at a time when Mr. and Mrs. Helfin-El were both in better health, is attached to this Reply in composite Exhibit G. Also included in Exhibit G is a photograph of Mr. Heflin-El in his current condition, while receiving a dialysis treatment. The steep decline in Mr. Heflin-El's physical condition is apparent from these photographs, which were taken several years apart.

Mr. Gonzalez described his relationship with Mr. Heflin-El to counsel as follows:

> I care and love him deeply … Ed might not be my biological father … but I love and care for him like he was my biological father if not more. Ed has cared for me, given me much good advice in our many visits, has taken care and loved my mom, my sister, my daughter, my grandmother in her dying days, and has consoled me so much through it all that I'd be crazy not to consider him my real father. Yes of course not my biological father … but my real father nonetheless. . . . [T]o me a real father is someone who steps up to the plate when the biological father is not around, and that's exactly what Ed has done and been to me. I wholeheartedly believe that now that he's not doing well is my turn to repay him for all the good that he's done as a father first and foremost, as a husband, and as a veteran.

Corresp. with counsel (Nov. 29, 2023).

The Court should recognize that a beloved stepparent, including a man who became a stepparent as an adult and yet stepped willingly and completely into a parental role, is in a relationship "similar in kind to that of an immediate family member." Because Mr. Heflin-El has such a relationship with Mr. Gonzalez, and because Mr. Heflin-El is incapacitated and in need of care for which there is no other available care provider, the Court should find Mr. Gonzalez has established that his family circumstances are an

---

[5] Counsel is presently attempting to obtain the visitor logs for Mr. Gonzalez since he has been incarcerated, and if counsel is able to do so, will file them as a supplemental exhibit.

extraordinary and compelling reason for a reduction in sentence.

    **B.**    **Mr. Gonzalez's rehabilitation and the onerous conditions of his confinement are additional extraordinary and compelling circumstances.**

Mr. Gonzalez's motion for reduction in sentence also explained the reasons that his rehabilitation and the onerous conditions under which he has been incarcerated are additional factors the Court should consider in evaluating whether he has established extraordinary and compelling reasons for compassionate release. Doc. 93 at 11-14. Significantly, Mr. Gonzalez has served his entire sentence of incarceration without a single disciplinary infraction, has participated in programming aimed at improving himself and preparing himself for release, and has received outstanding evaluations for his work as a leader in the Unicor work program. *See id.* at 12. Additionally, due to the impact of COVID on the BOP's operations, Mr. Gonzalez has suffered far harsher conditions of confinement than federal prisoners ordinarily experience. *See id.* at 12-14. The Court did not anticipate at the time of sentencing that these would be the conditions under which Mr. Gonzalez would serve his sentence; nor could Mr. Gonzalez have anticipated these conditions at the time he entered into a guilty plea. While the government does not address these factors in its response, they also support compassionate release.

***

For these reasons, the Court should find that Mr. Gonzalez has established extraordinary and compelling reasons supporting a reduction in sentence.

**II.**    **Mr. Gonzalez is not a danger to the community and consideration of the Section 3553(a) factors support release.**

Mr. Gonzalez also discussed in his compassionate release motion the reasons that he is not a danger to the community and that the factors set forth in 18 U.S.C. Section 3553(a) support a reduction of his sentence. Doc. 93 at 14-18. The government's responses to these points are discussed in turn below.

    *The nature of the offense*

The compassionate release motion explains that Mr. Gonzalez's offense was his role in the conspiracy led by his father, in which he was a driver for his father and his father's confederates. Doc. 93 at The government argues in response that Mr. Gonzalez is responsible for the actions of his co-conspirators and knew of the planned robbery, that firearms would be possessed in the

course of the robbery, and that they could be fired. Doc. 96 at 10. Mr. Gonzalez has consistently acknowledged that by participating in this conspiracy, he is responsible for the actions of the co-conspirators. That is the basis of his guilty plea. The fact remains, however, that Mr. Gonzalez did not himself personally possess a firearm, enter into any home or commit robbery there, or engage in drug trafficking.

This is not to minimize Mr. Gonzalez's conduct. He feels tremendous regret and remorse every day for his involvement in this conspiracy. The Court is entitled to consider, however, in evaluating Mr. Gonzalez's role in the offense and whether he is a danger to the community that his conduct was qualitatively different from that of his co-conspirators.

*The purposes of sentencing*

Mr. Gonzalez also discussed in his compassionate release motion the reasons that the purposes of sentencing have been satisfied here. Doc. 93 at 16-17. Mr. Gonzalez has been incarcerated for approximately twelve and half years, and as noted above, his sentence has been served under harsh conditions. When good conduct time is taken into account, Mr. Gonzalez has already served over half of his sentence. *See id.* at 17.

The government argues in response that the sentence Mr. Gonzalez received was within the advisory guideline range and was the sentence Mr. Gonzalez stipulated to. Given the continued prevalence of both plea bargaining and within-guidelines sentencing, it will generally be true that a defendant who seeks or receives compassionate release was sentenced within the applicable guidelines range, which has frequently been agreed-upon. Congress recognized in the First Step Act, however, and the Sentencing Commission has now put into effect, that compassionate release is warranted on a wider scale than has been granted in the past. Under the newly-revised Section 1B1.13, this specifically includes circumstances like Mr. Gonzalez's where a person with a similar relationship to an immediate family member is incapacitated and the defendant is the only available care provider. § 1B1.13(b)(3)(D).

The government also suggests that Mr. Gonzalez seeks compassionate release after having received the benefit of the bargain by escaping from a longer sentence. Doc. 96 at 12. The government is alluding to a mandatory minimum 80-year sentence Mr. Gonzalez could have received had he been convicted of and sentenced to all charged counts. *See id* at 3 & n. 1. The 80-year consecutive sentence the government describes would have resulted from "stacked" sentences under 18 U.S.C. Section 924(c). Section 924(c) was amended in the First Step Act to

8

eliminate the stacking of 924(c) counts in situations like Mr. Gonzalez's. It now provides for consecutive 25-year mandatory minimum sentences only when a defendant is convicted of a new Section 924(c) charge after a prior Section 924(c) conviction. *See* 924(c)(1)(C). If Mr. Gonzalez had been sentenced to a term of incarceration based on stacked Section 924(c) charges as the government suggests he could have, that would have been an additional basis for compassionate release under the newly-revised policy statement, which specifically provides that such an "unusually long sentence" is a potential basis for a reduction in sentence.[6]

Further, if the Court believes that the time Mr. Gonzalez has served is inadequate to satisfy the purposes of sentencing, the Court has options other than simply denying Mr. Gonzalez's motion. *See* Doc. 93 at 17. For example, Mr. Gonzalez has no objection to the court ordering as long of a term of home confinement it deems appropriate, including the entire remainder of his sentence. He does not seek a reduction in sentence for its own sake, but to have the ability to care for his ailing stepfather and his mother; home confinement would allow him to do so.

*Community safety*

As is discussed in the compassionate release motion, Mr. Gonzalez's BOP records convincingly demonstrate his rehabilitation. Doc. 93 at The government nonetheless argues that Mr. Gonzalez's criminal record shows that he is a present risk to the community now. Doc. 96 at 11 (citing PSR ¶¶ 22-29). The conduct the government relies on to suggest Mr. Gonzalez is dangerous took place in long in the past. Other than an unscored offense of Driving While License Suspended Unknowingly, all of the conduct the government points to took place between 1997 and 2006, when Mr. Gonzalez aged of 18 to 27, PSR ¶¶ 22-29, and the offense of conviction took place in 2011. For all of the intervening 12½ years, Mr. Gonalez has had impeccable conduct. He has obtained his GED, taken classes, and gained vocational skills, and has not had a single disciplinary incident. Doc. 93 at 12. At the age of 43, he has also reached a stage in his life that Sentencing Commission research shows presents reduced risk. *See id.* at 15. And Mr. Gonzalez

---

[6] Section 1B1.13(b)(6) provides as follows:
<u>Unusually Long Sentence</u>.—If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

has a PATTERN score of "Low," meaning the BOP itself has classified him as having a low risk of recidivism. *See id.*

Mr. Gonzalez also explained in his compassionate release motion that the offenses that resulted in him being deemed a career offender were a state marijuana trafficking charge and an incident in which Mr. Gonzalez went to the defense of his sister. Doc. 93 at 17-18. The government takes issue with the description of the latter incident as involving Mr. Gonzalez defending his sister when he believed she was in immediate physical danger. Doc. 96 at 12 n. 8. Mr. Gonzalez's sister has provided a statement describing to the Court in detail this incident, which as attached as Exhibit I. In summary, Ms. Gonzalez was home alone as a 16-year old when a young woman who had a dispute with her told Ms. Gonzalez she was coming to her house to fight her. Frightened, Ms. Gonzalez called her brother. Before Mr. Gonzalez was able to get to his sister's home, the young woman who had threatened Ms. Gonzalez had arrived there, along with her sister and two adult men. The two sisters, one of whom had brought a knife with her to Ms. Gonzalez's house, attacked Ms. Gonzalez, and sliced Ms. Gonzalez's hand with the knife. Mr. Gonzalez arrived and attempted to stop the fight. The two adult men who had accompanied the sisters accosted Mr. Gonzalez to stop him from intervening. In the fight among the three girls, Ms. Gonzalez gained control of the knife, and the two sisters were injured. *See* Ex. I. While this incident resulted in Mr. Gonzalez being convicted of a "crime of violence," and therefore being deemed a Career Offender, it does not represent the type of conduct that demonstrates Mr. Gonzalez is a threat to the community.

*\*\**

For these reasons, the Court should find that a reduction in sentence is consistent with the Section 3553(a) factors and that Mr. Gonzalez is not a threat to the community. The Court should grant compassionate release and reduce Mr. Gonzalez's sentence to time served to allow him to provide the care his stepfather needs.

## CONCLUSION

For these reasons and the reasons stated in Mr. Gonzalez's motion to reduce sentence, Mr. Gonzalez respectfully requests that this Court grant a reduction of his sentence to time served and order his immediate release.

Respectfully submitted,

/s/ Katherine Earle Yanes
Katherine Earle Yanes (FBN 0159727)
kyanes@kmf-law.com
KYNES, MARKMAN & FELMAN, P.A.
Post Office Box 3396
Tampa, Florida 33601-3396
Telephone:    (813) 229-1118
Facsimile:    (813) 221-6750

*Attorneys for Petitioner Rodger Gonzalez*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of this Motion was furnished to all counsel of record by the CM/ECF System, on December 8, 2023.

/s/ Katherine Earle Yanes
Katherine Earle Yanes
